IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SOUTH TEXAS FRAC LLC | § | |
|     *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. SA:20-cv-00678-OLG |
| | § | |
| PHOENIX PROCESS EQUIPMENT CO. | § | |
|     *Defendant.* | § | |

**SOUTH TEXAS FRAC LLC AND WI TEXAS FRAC LLC'S JOINT RESPONSE TO PHOENIX PROCESS EQUIPMENT CO.'S MOTIONS TO DISMISS**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW South Texas Frac LLC and WI Texas Frac LLC (collectively, "Plaintiff" or "South Texas Frac"), and file this their Joint Response to Phoenix Process Equipment Co.'s ("Phoenix" or "Defendant") Motions to Dismiss Pursuant to Rule 12(b)(6) [Docket Nos. 25 and 26], and respectfully show the Court as follows:

## I. INTRODUCTION

Phoenix sold South Texas Frac defective equipment. The defective equipment has cost South Texas Frac tens of millions of dollars. In an attempt to avoid the significant damage it has caused South Texas Frac, Phoenix seeks to dismiss most of South Texas Frac's claims based on a wall of fine-print boilerplate tacked on after the signature pages to the back of the agreements between the parties. Phoenix improperly seeks this dismissal on 12(b)(6) grounds with extrinsic evidence, but even if this were a motion for summary judgment, Phoenix's motion would fail. As pled in South Texas Frac's complaint, the plain terms of the disclaimers Phoenix relies upon are not implicated in

this lawsuit, and Phoenix attempts to stretch the language of such disclaimers much further than it goes. At best, the language is ambiguous and requires the analysis of extrinsic evidence. Moreover, the language of the disclaimers is inconspicuous and not enforceable, and the disclaimers are further unenforceable because Phoenix's warranties failed of their essential purpose. Given that the disclaimers are ambiguous, hidden in a wall of fine-print boilerplate, and Phoenix's warranties failed of their essential purpose, enforcement of the disclaimers would also be unconscionable. Most importantly for the Court, however, there can be no doubt that South Texas Frac has adequately pled all of its claims for relief, and therefore, Phoenix's motion to dismiss should be denied.

## II. Brief Note on South Texas Frac and WI Texas Frac

To fully analyze Phoenix's motions, a comment is necessary to explain the relationship between South Texas Frac LLC and WI Texas Frac LLC and why these two entities are included in this litigation with Phoenix over the same contracts. South Texas Frac contends that it is the party that contracted with Phoenix regarding the equipment at issue, while Phoenix contends that WI Texas Frac is the proper party to this dispute.

South Texas Frac is a Texas limited liability company that operates a frac sand plant in Floresville, Texas, which is at issue in this case. South Texas Frac filed the appropriate documents with the Texas Secretary of State, giving notice that it is a distinct Texas limited liability company. Indeed, one of the reasons that entities must file documents with the Texas Secretary of State is to give notice to contracting parties that the company is a distinct Texas entity. WI Texas Frac, on the other hand, is a Wisconsin limited liability company that operates a frac sand plant in St. Jo, Texas, which is **not** at

issue in this case. South Texas Frac and WI Texas Frac do have some overlapping ownership, but they do not have the same ownership. There are also some individuals who provide services for both South Texas Frac and WI Texas Frac; however, the majority of both entities' employees are solely employed by either South Texas Frac or WI Texas Frac. Nonetheless, despite the fact that WI Texas Frac has no involvement or ownership interest in the Floresville, Texas plant at issue in this litigation, Phoenix stubbornly insists that WI Texas Frac is the proper contracting party rather than South Texas Frac, unnecessarily delaying and complicating the prosecution of this litigation. Phoenix's position is based on a pre-existing relationship with WI Texas Frac to which it provided equipment at its St. Jo plant that is not at issue in this litigation. Phoenix contends that it believed it was dealing with WI Texas Frac despite no supporting evidence.

Phoenix persists in its stubborn insistence despite not a single contract document including the name "WI Texas Frac." Indeed, South Texas Frac has not seen a single document in the tens of thousands of pages of documents that have been produced by both sides in this litigation that even contains the name "WI Texas Frac." Rather, all contracts involved in this litigation are with "South Texas Frac" or "Texas Frac – San Antonio" or some similar variant thereof. Every single operation manual for the equipment at issue in this litigation is addressed to "South Texas Frac." Every single payment relating to the equipment at issue in this litigation was made by South Texas Frac.[1] There is no support for Phoenix's stubborn insistence that WI Texas Frac is the

---

[1] WI Texas Frac did make the first payment to Phoenix on behalf of South Texas Frac to expedite the project while South Texas Frac's financing was pending. However, South Texas Frac reimbursed WI Texas Frac

proper contracting party; however, it should not be surprising that a company that sells defective equipment does not even know, nor apparently sought to discover by checking with the Texas Secretary of State, who it is contracting with.

In order to avoid unnecessary confusion and duplication of pleadings, South Texas Frac and WI Texas Frac are referred to herein collectively as Plaintiff or South Texas Frac. All arguments and allegations are made by South Texas Frac, and WI Texas Frac merely asserts them in the alternative in an abundance of caution to avoid any loss of remedies caused by Phoenix's defective equipment in the unlikely event a determination is made that WI Texas Frac was actually the contracting party. Phoenix's motions to dismiss are identical, and the reasons they should be denied are identical. Therefore, to avoid unnecessary duplication, South Texas Frac and WI Texas Frac file this joint response.

### III. FACTUAL BACKGROUND[2]

1.     This case involves defective equipment Defendant Phoenix Process Equipment Co. sold South Texas Frac for its sand plant. [Dkt. No. 29-1, IV, ¶ 1.01].

2.     South Texas Frac operates a frac sand plant in Floresville, Texas. In or about August 2018, South Texas Frac contracted with Phoenix for the selection, design, and purchase of equipment for use in South Texas Frac's frac sand plant. South Texas Frac provided Phoenix samples from its sand pit, and Phoenix promised to select, design, and sell equipment to South Texas Frac that was fit to process South Texas Frac's sand and

---

for this payment, and South Texas Frac made all other payments to Phoenix directly without any complaint from Phoenix.

[2] The following factual pleadings are taken from South Texas Frac's Second Amended Complaint [Dkt. No. 29-1] and WI Texas Frac's First Amended Counterclaims [Dkt. No. 30-1]. Motions for leave were filed timely on January 15, 2021 for both parties to amend their pleadings, which are currently pending before the Court. [*See* Dkt. Nos. 29 and 30]. To avoid duplication, Plaintiff will cite South Texas Frac's Secomd Amended Complaint in this Joint Response.

could do so at an output rate of 300 tons per hour. Before South Texas Frac decided to purchase Phoenix's equipment, Phoenix made the following false representations and warranties, among others, which South Texas Frac relied upon in entering into a contractual relationship with Phoenix and formed the basis of the bargain:

1. Phoenix was experienced in selecting and designing equipment for frac sand plants with similar type sand as South Texas Frac.

2. Phoenix's equipment would be fit to process South Texas Frac's sand.

3. South Texas Frac would be able to input a minimum of 400 tons per hour of sand through Phoenix's equipment.

4. Phoenix's equipment would process sand at an output rate of 300 tons per hour.

5. Phoenix's equipment would produce sand with 16-20% moisture.

6. Phoenix's equipment would capture and dewater sand sized 50 mesh x 180 mesh. [Dkt. 29-1, IV, ¶ 1.02].

3. The installation of the equipment was completed in or about June 2019; however, South Texas Frac immediately began experiencing issues with the equipment. The equipment constantly malfunctioned and had difficulty processing South Texas Frac's sand. South Texas Frac experienced the following issues:

1. South Texas Frac could only input approximately 200 tons per hour of sand through Phoenix's equipment, approximately half the warranted and represented rate.

2. The equipment only produced approximately 100 tons per hour of sand, approximately a third of the warranted and represented rate.

3. The sand that Phoenix's equipment produced contained 30% moisture instead of the 16-20% moisture content that was warranted and represented. The much higher moisture content also meant that the 100 tons per hour of sand that was processed actually had even less sand

than represented since much more of the weight was due to water in the sand than actual sand. The higher moisture content also caused increased costs and time for drying the sand, further damaging South Texas Frac.

4. Phoenix's equipment disposed of high quantities of marketable 50 mesh x 180 mesh sand, despite Phoenix's representations and warranties that the equipment was designed to capture and dewater such sand. [Dkt. No. 29-1, IV, ¶ 1.03].

4. South Texas Frac quickly notified Phoenix of the issue, and Phoenix spent months attempting to repair the equipment (and even charged South Texas Frac for its repair efforts), but Phoenix was ultimately unsuccessful. Therefore, South Texas Frac rejected the equipment, or alternatively, revoked its acceptance of the equipment, and attempted to return the defective equipment for a full refund, but Phoenix refused, necessitating the filing of this lawsuit. [Dkt. No. 29-1, IV, ¶ 1.04].

5. Phoenix's defective equipment has caused South Texas Frac tens of millions of dollars in damages. First, South Texas Frac has been damaged in the amount of $3,256,210.00 which it paid Phoenix for the defective equipment. The equipment is completely worthless to South Texas Frac, and South Texas Frac has decommissioned it. Second, South Texas Frac seeks to recover the approximately $600,000 it has incurred purchasing new equipment to replace Phoenix's equipment. Third, South Texas Frac seeks to recover at least $25 million in losses which continue to accrue daily resulting from the defective equipment and disposal of South Texas Frac's marketable sand. Finally, South Texas Frac seeks to recover any amounts it paid Phoenix for Phoenix's repair efforts, which should have been covered by Phoenix's warranty. [Dkt. No. 29-1, IV, ¶¶ 1.05-1.08].

6.      Further investigation of Phoenix and the equipment it sold to South Texas Frac reveals that Phoenix's equipment is primarily used for gravel and coarse construction sand. Despite knowing that South Texas Frac sought to capture and dewater fine sand sized 50 mesh x 180 mesh, Phoenix pressed forward without any experience using its equipment to capture and dewater such sand. In a rush to obtain a sale, Phoenix represented to South Texas Frac that its equipment would be able to process South Texas Frac's fine sand, but Phoenix failed to disclose that its equipment was used for gravel and coarse construction sand and had not been tested for fine sand, costing South Texas Frac tens of millions of dollars. [Dkt. No. 29-1, IV, ¶ 1.09].

7.      Based on the above, detailed allegations, South Texas Frac asserts claims against Phoenix for breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, breach of contract, negligence, products liability, negligent misrepresentation, fraud, and fraud by nondisclosure. [Dkt. No. 29-1, ¶¶ 5.01-5.45].

## IV. STANDARD OF REVIEW

8.      Federal Rule of Civil Procedure 8(a) requires that a pleading include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 346 (5th Cir. 2013) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). Generally, motions to dismiss for failure to state a claim are viewed with disfavor and

rarely granted. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). If the complaint provides fair notice of the claim and the factual allegations are sufficient to show that the right to relief is plausible, a court should deny the defendant's motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In addition, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." *Id*. South Texas Frac's pleadings are more than sufficient to satisfy 12(b)(6) and 9(b) standards.

## V. ARGUMENT & AUTHORITIES

### A. *Phoenix's Motions to Dismiss should be denied because they rely upon extrinsic evidence.*

9.      As an initial matter, South Texas Frac objects to Phoenix's use of extrinsic evidence in support of its Motions to Dismiss. [*See* Dkt. Nos. 25-1 and 26-1]. Generally, in deciding a motion to dismiss for failure to state a claim, the court limits its inquiry to facts stated in the complaint. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Indeed, Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." South Texas Frac requests that the Court exclude the evidence and deny Phoenix's motion, but in the alternative, South Texas Frac requests that the motion be converted to one for summary judgment and allow South Texas Frac time to finish

conducting discovery before a response is due. Numerous depositions are currently being scheduled for the weeks of February 15 and 22, 2021, and if the motion is converted to one for summary judgment, South Texas Frac should not be required to respond until discovery is completed.

10.    Phoenix does cite a Fifth Circuit case that provides that a court may review "any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *See Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019). However, the use of extrinsic evidence was not an issue in the case Phoenix cites, and other cases that allow use of extrinsic evidence involve scenarios where a public record is involved, the document is not critical to the outcome of the case, or the document is used by the plaintiff to illustrate facts it expects to be able to prove. *See, e.g., Little Gem Life Sci. LLC v. Orphan Med., Inc.*, 537 F.3d 913, 916 (8th Cir. 2008) (court could consider public records without converting motion under FRCP 12(d) when records were background facts, did not contradict complaint, and were not critical to outcome of motion); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996) (in securities-fraud claim, court could consider public-disclosure documents filed with SEC without converting motion under FRCP 12(d)); *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (plaintiff opposing FRCP 12(b)(6) motion has more flexibility with extrinsic materials to illustrate facts it expects to be able to prove).

11.    In this case, the series of contracts between the parties are not the central issue in this case; rather, the defective equipment and the representations made around the defective equipment are the central issues. It would not serve the purposes of Rule

12(b)(6) to dismiss millions of dollars in claims based on extrinsic evidence while depositions and other discovery are pending. As will be demonstrated below, there are numerous legal and fact issues arising around Phoenix's interpretation of the agreements and its attempts to enforce them, which militates against considering the contracts as extrinsic evidence at this early date. Therefore, the Court should exclude the extrinsic evidence and deny Phoenix's motions to dismiss.

### B. *South Texas Frac's fraud and negligent misrepresentation claims easily satisfy federal pleading standards.*

12.     Phoenix's motion to dismiss South Texas Frac's fraud and negligent misrepresentation claims is ironically conclusory and threadbare. Indeed, while arguing that South Texas Frac's claims are threadbare recitals of the elements of its causes of action supported by conclusory statements, Phoenix merely recites the elements of South Texas Frac's fraud and negligent misrepresentation claims and states in conclusory fashion that no facts are asserted to support these elements. [Dkt. 25, ¶ 15].

13.     However, South Texas Frac provides detailed pleadings of the false representations Phoenix made to South Texas Frac to induce South Texas Frac into the agreements with Phoenix and how these representations turned out to be false. [Dkt. No. 29-1, ¶¶ 5.29-5.40]. As alleged in South Texas Frac's pleadings, Phoenix made the following nonexclusive list of material misrepresentations:

> a. Phoenix was experienced in selecting and designing equipment for frac sand plants with similar type sand as South Texas Frac.

> b. Phoenix's equipment would be fit to process South Texas Frac's sand.

    c.   South Texas Frac would be able to input a minimum of 400 tons per hour of sand through Phoenix's equipment.

    d.   Phoenix's equipment would process sand at an output rate of 300 tons per hour.

    e.   Phoenix's equipment would produce sand with 16-20% moisture.

    f.   Phoenix's equipment would capture and dewater sand sized 50 mesh x 180 mesh. [Dkt. No. 29-1, ¶¶ 5.29, 5.35]

14.    These representations turned out to be false for the following reasons:

    a.   Phoenix did not have experience in selecting and designing equipment for processing fine sand. Its experience is limited to selecting and designing equipment for processing gravel and coarser construction sand.

    b.   Phoenix's equipment was not fit to process South Texas Frac's fine sand. Rather, such equipment is primarily used for gravel and coarser construction sand.

    c.   South Texas Frac could only input approximately 200 tons per hour of sand through Phoenix's equipment, approximately half the represented rate.

    d.   The equipment only output approximately 100 tons per hour of sand, approximately a third of the represented rate.

    e.   The sand that Phoenix's equipment produced contained 30% moisture instead of the 16-20% moisture content that was represented.

    f.   Phoenix's equipment disposed of high quantities of marketable 50 mesh x 180 mesh sand, despite Phoenix's representations that the equipment was designed to capture and dewater sand sized 50 mesh x 180 mesh. [Dkt. No. 29-1, ¶¶5.31, 5.36].

15.    Importantly, further investigation of Phoenix and the equipment it sold to South Texas Frac reveals that Phoenix's equipment is primarily used for gravel and coarser construction sand. Despite knowing that South Texas Frac sought to capture and

dewater fine sand sized 50 mesh x 180 mesh, Phoenix pressed forward without any experience using its equipment to capture and dewater such sand. In a rush to obtain a sale, Phoenix represented to South Texas Frac that its equipment would be able to process South Texas Frac's fine sand, but Phoenix failed to disclose that its equipment was used for gravel and coarser construction sand and had not been tested for fine sand, costing South Texas Frac tens of millions of dollars. [Dkt. No. 29-1, IV, ¶ 1.09].

16.     South Texas Frac has pled detailed allegations of fraud and misrepresentations. [*See* Dkt. Nos. 29-1 and 30-1]. Indeed, some of Phoenix's misrepresentations are contained within the very documents Phoenix attaches to its motion. [*See, e.g.*, Dkt. 25-1, p. 8 ("[The equipment] is designed to capture and dewater customer silica sand product nominal 50 mesh x 180 mesh.")]. Numerous emails between the parties have been produced in this litigation that also demonstrate Phoenix's misrepresentations. South Texas Frac's pleadings are more than sufficient to allege claims for fraud and negligent misrepresentation, and Phoenix's motion is meritless and should be denied.

17.     As a final note, Phoenix also relies upon an alleged "merger" clause to argue that South Texas Frac's fraud and negligent misrepresentation claims should be dismissed:

> **10. COMPLETE AGREEMENT**
> This complete agreement between PHOENIX and Purchaser is contained herein and no additional or different term or condition stated by Purchaser will be binding unless agreed to by PHOENIX in writing. It is agreed that no other agreement expressed or implied exists between PHOENIX and Purchaser which would supersede this agreement.

As Phoenix does throughout its motions to dismiss, it stretches this language much further than it actually goes. Indeed, Phoenix treats this language as if it disclaims reliance on representations made prior to contract formation; however, the language makes no mention of representations. Rather, it is simply a boilerplate "Complete Agreement" clause that merely states there are no additional terms to the agreements. The boilerplate only applies to "additional or different term[s] or condition[s] **stated by Purchaser**" and is thus even further removed from Phoenix's misrepresentations. On the other hand, the case Phoenix relies upon actually included a disclaimer of representations and inducements not included in the contract. *Lindsey v. Lone Star R.V. Sales*, No. H-08-1777, 2009 WL 1269717 at *3 (S.D. Texas May 7, 2009) ("[N]o 'other representation or inducement, verbal or written, has been made which is not contained in this contract.'"). Thus, Phoenix's argument fails, and its motions to dismiss should be denied.

### C.  Consequential Damage Waiver

**a.  The plain terms of the alleged "consequential damage waiver" only apply in the case of a failure of components Phoenix purchased and incorporated into the agreement.**

18.     Phoenix argues that an alleged consequential damage waiver bars South Texas Frac's recovery of consequential damages. However, Phoenix's argument is premised on an out-of-context and misleading citation of the alleged "consequential damage waiver." Specifically, the "consequential damage waiver" states in full as follows:

> **In the case of any failure of components purchased by PHOENIX and incorporated into any of the products or systems provided by PHOENIX under this agreement**, PHOENIX's guarantee is limited to the component

> manufacturer's guarantee. It is agreed PHOENIX shall not be held liable for any further cost, expense, or labor to replace equipment or parts or for any of Purchaser's consequential, incidental, or indirect damages including but not limited to injury to person or property, loss of profits, loss of business reputation, down time, or any expenses that may result as a breach of this agreement.

(emphasis added). Notably, this consequential damage waiver only occurs "[i]n the case of any failure of components purchased by PHOENIX and incorporated into any of the products or systems provided by PHOENIX under this agreement." Phoenix removed the first sentence of this paragraph in its citation of the contract to provide the impression that the consequential damage waiver applies in all circumstances but that is not what the plain terms of the agreement provide. Because South Texas Frac's claims are not premised on a failure of components Phoenix purchased and incorporated into the equipment, the consequential damage waiver is not applicable in this case.

19.     Interpreting the "consequential damage waiver" to waive South Texas Frac's consequential damages under all circumstances would contravene the intent of the parties as expressed in the contracts. The primary concern of a court interpreting a contract is to ascertain and to give effect to the intentions of the parties as expressed in the contract. *Plains Exploration & Production Co. v. Torch Energy Advisors, Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). Interpreting a contract requires determining the common intent of the parties, looking first to the words and provisions of the contract, and when the words are "clear and explicit and lead to no absurd consequences," a court's inquiry into the parties' intent ends. *Star Fin. Servs. v. Cardtronics United States*, 882 F.3d 176, 179 (5th Cir. 2018). Each part of a contract must be considered in relation to every other part so that

the effect of each part on the others may be determined. *El Paso Field Services v. Mastec N.A.*, 389 S.W.3d 802, 805 (Tex. 2012). A contract is construed in accordance with the plain meaning of its language. *Plains Exploration & Production Co.*, 473 S.W.3d at 305.

20.     The words are clear and explicit that the "consequential damage waiver" occurs in the event of a failure of components Phoenix purchased and incorporated into the equipment. It would be absurd to interpret the "consequential damage waiver" to waive all of South Texas Frac's consequential damages under all circumstances when it is buried in a paragraph relating to a very specific circumstance. Indeed, specific language in a contract will overcome and control general provisions. *Tri-County Elec. Coop., Inc. v. GTE Southwest Inc.*, 490 S.W.3d 530, 540 (Tex. App.—Fort Worth 2016, no pet. h.). Moreover, Phoenix drafted the agreement and language in question, and ambiguities are to be construed against the drafter of the contract. *Republic Nat'l Bank v. Northwest Nat'l Bank*, 578 S.W.2d 109, 115 (Tex. 1978). Ultimately, although the terms are clear, even if the Court believed the provision was ambiguous, a finding of ambiguity requires consideration of extrinsic evidence for intent of the contracting parties, and dismissal for failure to state a claim would be inappropriate.

**b. Even if the "consequential damage waiver" applied to South Texas Frac's claims, Phoenix's warranties have failed of their essential purpose, and any limitations of warranties or remedies are not effective.**

21.     South Texas Frac has pled that Phoenix's warranties failed of their essential purpose because Phoenix was unable to repair the equipment after numerous attempts. [Dkt. No. 29-1, ¶¶ 5.05, 5.43]. Texas Business & Commerce Code § 2.719(b) provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential

purpose, remedy may be had as provided in this title." Many other sections in the Texas Business & Commerce Code permit recovery of consequential damages. *See, e.g.*, Tex. Bus. & Comm. Code §§ 2.714(c), 2.715. South Texas Frac has pled sufficient facts for its consequential damage claim to survive.

### c. Enforcement of Phoenix's interpretation of the "consequential damage waiver" would be unconscionable.

22.     South Texas Frac has also pled that enforcement of the alleged "consequential damage waiver" would be unconscionable. [Dkt. No. 29-1, ¶ 5.43]. Section 2.719(c) provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." The exclusion of South Texas Frac's tens of millions of dollars in consequential damages would be unconscionable in this case because the "consequential damage waiver" is at best ambiguous as discussed above, it is buried within a wall of fine-print boilerplate and inconspicuous, and Phoenix's warranties failed of their essential purpose. South Texas Frac's allegations are sufficient, and Phoenix's motions to dismiss should be denied.

### d. Collateral damage to South Texas Frac's sand is recoverable under its negligence and products liability claims.

23.     Phoenix also seeks to dismiss South Texas Frac's damage claims arising from the disposal of its fine sand by Phoenix's equipment. Phoenix characterizes such damage as a consequential damage. However, the Texas Supreme Court has held that "[w]here such collateral property damage exists in addition to damage to the product itself, recovery for such damages are recoverable under Section 402A of the Restatement (Second) of Torts as damage to property or under the Texas Business and Commerce

Code, Section 2.715, as consequential damages for a breach of an implied warranty." *Signal Oil and Gas Co. v. Universal Oil Products*, 572 S.W.2d 320, 325 (Tex. 1978). Thus, even if the damages were barred as consequential damages pursuant to South Texas Frac's warranty claims, they would still be recoverable pursuant to South Texas Frac's tort claims for negligence and products liability.

### D.  Waiver of Express and Implied Warranties

**a.  The warranty disclaimer does not exclude or limit warranties set forth in the agreements between the parties.**

24.     Phoenix once again misleadingly cites the approximately 6-point font boilerplate at the end of its agreements in an attempt to obtain dismissal of South Texas Frac's claims. Specifically, Phoenix acknowledges that a 12-month materials and workmanship warranty exists but argues that "[t]he contract explicitly states that Phoenix is not making any other express warranties concerning its products." [See Dkt. 25, ¶ 26]. However, the agreement states otherwise:

> PHOENIX warrants that its products covered by this quotation are free from defects in material and workmanship. **Except for the express warranties set forth in this Agreement**, Purchaser acknowledges and agrees that PHOENIX is making no warranties, express or implied, concerning the products, including, without limitation, any warranty of merchantability or fitness for a particular purpose.

(emphasis added). Notably, according to the plain terms of the agreement, other express warranties set forth in the agreement are not waived or disclaimed. As alleged in South Texas Frac's pleadings and as evidenced by the contract documents Phoenix attached to its motions to dismiss, the contract documents warrant in numerous places that (1) South Texas Frac would be able to input a minimum of 400 tons per hour through Phoenix's

equipment; (2) Phoenix's equipment would produce sand with 16-20% moisture; and (3) Phoenix's equipment would capture and dewater sand sized 50 mesh x 180 mesh. [*See, e.g.*, Dkt. 25-1, p. 8 ("[The equipment] is designed to capture and dewater customer silica sand product nominal 50 mesh x 180 mesh." and "Dewatered sand @ 16-20% moisture to be discharged to customer supplied conveyer / stacker." and "Capacity: up to nominal 473 stph sand product.")]. These warranties are not disclaimed by the contract documents, and South Texas Frac's allegations are more than sufficient to support a breach of these warranties.

**b. The warranty disclaimer does not disclaim Phoenix's express warranty that its equipment would process sand at an output rate of 300 tons per hour.**

25.      Phoenix's representation and warranty that its equipment would process South Texas Frac's sand at an output rate of 300 tons per hour was the very basis of South Texas Frac's bargain with Phoenix. Indeed, emails demonstrate that South Texas Frac contacted Phoenix seeking equipment that could process its sand at such rate and that the ability or inability of the equipment to process South Texas Frac's sand at an output rate of 300 tons per hour was the central issue throughout the parties' entire relationship. Texas Business & Commerce Code § 2.316(a) provides that "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (Section 2.202) negation or limitation is inoperative to the extent that such construction is unreasonable." Courts have interpreted this provision to provide that a general warranty disclaimer does

not disclaim an oral express warranty that served as the basis of the bargain. *Mobile Hous., Inc. v. Stone*, 490 S.W.2d 611, 614-15 (Tex. App.—Dallas 1973, no writ) (written purchase agreement stating home was sold "as is" did not disclaim oral express warranty that home would conform to description given by salesman). Indeed, extensive email correspondence between South Texas Frac and Phoenix demonstrates that both parties expected that the equipment would process sand at an output rate of 300 tons per hour. Phoenix cannot disclaim such a warranty by merely tacking on fine-print boilerplate to the end of its contracts, and dismissal of South Texas Frac's claims at this stage is certainly inappropriate as South Texas Frac has clearly sufficiently pled its claim.

### c. The implied warranty disclaimer is not conspicuous.

26.     Phoenix's attempted implied warranty disclaimer also fails. As Phoenix acknowledges, implied warranty disclaimers must be in writing and conspicuous. Tex. Bus. & Comm. Code § 2.316(b); *see also* Dkt. 25, ¶ 29. In this case, it is indisputable that the implied warranty disclaimer is not conspicuous. It is in approximately 6-point font among a wall of boilerplate text attached to the end of the contracts after the signature page. Phoenix argues that the disclaimer is conspicuous because it is included in a section heading with capitalized and bold-faced font entitled "**6.   WARRANTY & GUARANTEE.**" There are two notable issues with this argument. First, every section heading in the fine-print boilerplate is bold faced and capitalized, and all are in the same approximately six-point font. The heading is set apart in no way from the other headings in the boilerplate. Second, the caption only states "**WARRANTY & GUARANTEE**" and there is no indication that any warranties or remedies are disclaimed or limited. This is

contrary to the Fifth Circuit case Phoenix cites where all language of the disclaimer was bolded and set apart from the rest of the contract and the section heading was entitled "**EXCLUSIVE WARRANTIES AND REMEDIES**," clearly providing notification that warranties and remedies were being limited. *American Eagle Ins. Co. v. United Technologies Corp.*, 51 F.3d 468, 469 (5th Cir. 1995). There is no reasonable argument that Phoenix's implied warranty disclaimer is conspicuous, and therefore, it is not enforceable. There is no basis to dismiss South Texas Frac's claims on these grounds.

**d. Because Phoenix's warranties failed of their essential purpose, any attempted warranty disclaimers are ineffectual.**

27.     As discussed in ¶ 21 of this Response, South Texas Frac has pled that Phoenix's warranties failed of their essential purpose because Phoenix was unable to repair the equipment. [Dkt. No. 29-1, ¶¶ 5.05, 5.43]. Therefore, pursuant to Texas Business & Commerce Code § 2.719(b), Phoenix's warranty disclaimers are unenforceable, and sufficient facts have been pled for South Texas Frac's claims to survive.

## VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, South Texas Frac LLC and WI Texas Frac LLC pray that Phoenix Process Equipment Co.'s Motions to Dismiss [Docket Nos. 25 and 26] be denied and for such other and further relief, at law or in equity, to which South Texas Frac and WI Texas Frac are entitled.

Respectfully submitted,

POPE, HARDWICKE, CHRISTIE, SCHELL,
  KELLY & TAPLETT, L.L.P.

By:____/s/  Robert L. Florance, IV
        Robert L. Florance, IV
        State Bar No. 24087520

500 W. 7th Street, Suite 600
Fort Worth, Texas  76102
Telephone No. (817) 332-3245
Facsimile No.  (817) 877-4781
Email:  rflorance@popehardwicke.com

/s/ Michael McCrum
Michael McCrum
Texas State Bar No. 13493200
MCCRUM LAW OFFICE
404 East Ramsey Rd., Suite 102
San Antonio, Texas 78216
Phone: (210) 225-2285
Fax: (210) 225-7045
michael@mccrumlegal.com
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been forwarded to all counsel of record using the CM/ECF system on this 19th day of January, 2021 in accordance with the Federal Rules of Civil Procedure.

/s / Robert L. Florance, IV
Robert L. Florance, IV